BARRETT S. LITT, SBN 45527
blitt@mbllegal.com
LINDSAY BATTLES, SBN 262862
lbattles@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 E. Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

SCOTT B. RAPKIN, SBN 261867
E-Mail: scottrapkin@rapkinesq.com
MICHAEL S. RAPKIN, SBN 67220
E-Mail: msrapkin@gmail.com
Rapkin & Associates, LLP
475 Washington Blvd.
Marina del Rey, California 90292
Telephone: (310) 319-5465
Facsimile: (310) 319-5355

Attorneys for Plaintiff Agustin Herrera

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUSTIN HERRERA, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; LOS ANGELES COUNTY DEPARTMENT OF PROBATION, CHIEF PROBATION OFFICER ADOLFO GONZALEZ, in his personal capacity, FORMER CHIEF PROBATION OFFICERS RAY LEYVA (interim), TERRI MCDONALD, and JERRY POWERS, in their personal capacities, LOS ANGELES COUNTY DEPARTMENT OF MENTAL HEALTH and DOES 1-20, inclusive | CASE NO.<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) §1983 DUE PROCESS VIOLATION – Unconstitutional Conditions of Confinement<br><br>(2) §1983 DUE PROCESS VIOLATION – Use of Mechanical Restraints<br><br>(3) §1983 DUE PROCESS VIOLATION – Room Confinement / Solitary Confinement<br><br>(4) §1983 DUE PROCESS & FOURTH AMENDMENT VIOLATION – Excessive Use of Chemical Force |

1

Defendants.

(5)  §1983 DUE PROCESS VIOLATION – Deliberate Indifference to Mental Health Condition

(6)  VIOLATION OF THE ADA, 42 U.S.C. §12101; REHABILITATION ACT, 29 U.S.C. §794

**DEMAND FOR JURY TRIAL**

I.    **INTRODUCTION**

1.    This proposed class action lawsuit arises from inhumane and unconstitutional conditions of confinement in Los Angeles County's two juvenile hall facilities: Central Juvenile Hall (CJH) and Barry J. Nixdorf Juvenile Hall (BJN).[1] Both facilities are operated by the Los Angeles Department of Probation, which has persistently failed to ensure reasonably safe conditions for the youth assigned to its care.

2.    Under California law, juvenile halls exist "solely for the purpose of rehabilitation and not punishment."[2] California requires juvenile detention facilities to provide "safe and supportive homelike environments[s]" that are not treated as "penal institution[s]," (Welfare and Institutions Code §851). Despite these mandates, Los Angeles County (County) has failed to provide for even the basic needs of detained youth. Instead of providing a safe and rehabilitative environment, both juvenile halls are characterized by dehumanizing and unconstitutional conditions of confinement, in which youth face significant risks to their physical safety and mental well-being.

3.    The conditions include depriving youth of (i) access to bathrooms,

---

[1] In addition to the two juvenile detention centers ("juvenile halls"), Los Angeles County operates six juvenile camps, including the Dorothy Kirby Center (DKC). Juvenile halls are used for pre-adjudicated youth, while juvenile camps are used for post-disposition youth detainees. Conditions at the juvenile camps are not addressed by this lawsuit.
[2] *People v. Olivas*, 17 Cal.3d 236, 254 (1976).

especially at night, forcing them to relieve themselves either on the floor of their room or, if available, bottles and milk cartons; (ii) clean and unused underwear; (iii) proper clothing, bedsheets and blankets to keep them warm in the cold facility at night, including as a form of punishment, causing significant discomfort and making it difficult to sleep; (iv) basic privacy in bathrooms and showers; and (v) minimum required outdoor recreation and programming time.  The facilities are filthy and unsanitary, and cockroaches are often found in their rooms and in their food.  Moreover, due to staff shortages, lack of training, and deficient policies (including the absence of any formal classification policy), probation staff unlawfully subject youth to excessive and unreasonable chemical force, room confinement/solitary confinement, and mechanical restraints, all of which are widely acknowledged to carry the risk of significant and sometimes irreparable physical and psychiatric harm to detained youth. The conditions described in this lawsuit recently lead one commentator to note that "If these were my children, [the Department of Child Services] would have been knocking on my door yesterday and they would have been put in foster care."[3]

    4.      Oversight agencies at every level have recognized Los Angeles County's persistent failure to address unlawful and inhumane conditions in the juvenile halls, including the United States Department of Justice, California Attorney General, the Los Angeles Office of the Inspector General, the Los Angeles County Department of Mental Health, the Probation Oversight Commission (POC), and the California Board of State and Community Corrections (BSCC).

    5.      In October of 2018, the California Attorney General's Office (Attorney General) began an investigation to determine whether the County

---

[3]  Jeremy Loudenback, *More Troubling Conditions Revealed at L.A. County Juvenile Hall*, The Imprint, February 2, 2022 < https://imprint news.org/justice/juvenile-justice-2/more-troubling-conditions-revealed-at-l-a-county-juvenile-hall/62410 > [as recently as Feb. 14, 2022]

complied with state and federal laws with respect to the conditions of confinement within the juvenile halls. The investigation encompassed use of force, room confinement/solitary confinement, programming, education, and access to medical and mental health care. Based on a review of voluminous documents, multiple site visits, and interviews of more than 80 witnesses, the Attorney General's investigation found that the County subjected youth to illegal and unconstitutional conditions of confinement and endangered youth safety. This investigation resulted in an injunctive relief lawsuit filed in January 2021, followed by a Stipulated Judgment, entered January 21, 2021. The stipulated judgment provides for various policy reforms, with compliance and implementation to be overseen by a team of monitors.

6.    Months after the stipulated judgement was entered, on September 16, 2021, in a historical and unprecedented vote, the BSCC unanimously found that housing conditions at both CJH and BJN were unsuitable for housing youth. The vote was precipitated by numerous statutory violations related to room confinement, excessive force, the use of mechanical restraints and general habitability concerns. The BSCC also found that the Probation Department lacked a formal classification system. The absence of a formal classification system is a significant contributing factor to other safety concerns including the excessive use of room confinement and excessive use of pepper spray.

7.    The problems only persist. As recently as February 2, 2022, the POC reported that recent inspections of CJH and BJN reveal that there continues to be a lack of clean clothes; the continued use of disposable underwear; complaints of "consistent" bugs in food, including maggots and worms; broken, leaking and clogged toilets; broken and leaking pipes that have not been repaired for more than a year; water damage; mold; excessive paint chipping and possible asbestos in rooms;  and illegal restraints and room confinement.

8. This long, sordid history of the County's juvenile halls has caused substantial harm – in many cases irreparable harm – to thousands of children and adolescents. While there have been consent decrees and agreements that attempt to fix the innumerable problems, the County has not been held to account, and *the victims* have never received compensation for the harms they have endured. This lawsuit seeks to remedy that injustice.

## II. <u>JURISDICTION AND VENUE</u>

9. Plaintiffs present federal claims for relief under  42 U.S.C. §1983, the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §1331.

10. Venue is proper because all of Plaintiff's claims arise out of acts of the Defendants, which are located within the Central District of California.

## III. <u>PARTIES</u>

11. Plaintiff Agustin Herrera is a 19 year-old man, who was detained several times in CJH and BJN between 2014-2019.[4]  Plaintiff seeks damages on behalf of himself and all others similarly situated for the unconstitutional conditions he endured within both juvenile hall facilities, including uninhabitable living quarters lacking sufficient access to bathrooms and warm bedding/night clothes; insufficient clean clothing and toiletries; and lack of access to phones to communicate with family and attorneys. Plaintiff also seeks damages for himself and all others similarly situated for the County's unconstitutional policies, practices and customs with regard to mechanical restraints, room confinement,

---

[4] This Action is timely as it has been brought less than two years from the date that Plaintiff turned 18. *See* Cal. Code Civ. Proc. § 352 (a) (statute of limitations is tolled until plaintiff reaches their 18th birthday); *Shalabi v. City of Fontana*, 11 Cal.5th 842, 847 (2021) (state law controls tolling of statute of limitations for federal civil rights claims).

5

1  excessive force and insufficient mental health care services within the juvenile

2  halls.

3       12.    Defendant County of Los Angeles is a county of the State of

4  California duly organized under the laws of the State of California.  The agency

5  within Los Angeles County particularly responsible for managing and addressing

6  the County's juvenile facilities and those detained within them is Defendant Los

7  Angeles County Probation Department ("Probation" or "Department of

8  Probation"), a public County-operated probation services agency organized and

9  existing under the laws of the State of California in the County of Los Angeles.

10      13.    The agency responsible for providing mental health services to youth

11  detained within the juvenile hall facilities is Defendant Los Angeles County

12  Department of Mental Health (DMH), a public County-operated mental health

13  department organized and existing under the laws of the state of California in the

14  County of Los Angeles.

15      14.    These agencies, as well as the County itself, are under the ultimate

16  control of the Los Angeles County Board of Supervisors, which is the County's

17  governing board. The Los Angeles County Board of Supervisors is responsible for

18  providing and maintaining, at the expense of the County, a juvenile hall, which is

19  a suitable house or place for the detention of wards and dependent children of the

20  juvenile court and of young people alleged to come within the jurisdiction of the

21  juvenile court.

22      15.    Defendants also include Probation Department individual defendants

23  ("Probation Department Defendants"). These defendants are named based on their

24  personal involvement and/or  supervisorial liability for their role in the

25  constitutional deprivations alleged herein, including but not limited to their

26  establishment, setting in motion, failing to terminate, ratification, implementation,

27  institution, and/or execution of the unconstitutional actions, policies, practices and

28  customs within the juvenile halls, and/or failure to adequately train or supervise

6

Probation Department personnel who engaged in the conduct alleged herein.

      a.  Current Chief Probation Officer Adolfo Gonzalez (2021 – present)

      b.  Former Interim Chief Probation Officer Ray Leyva (2020 – 2021)

      c.  Former Chief Probation Officer Terri McDonald (2017 – 2020)

      d.  Former Chief Probation Officer Jerry Power (2012 – 2017)

16.    Each of the above-listed individual defendants were the chief executive officers and final policy makers for the Probation Department. They were responsible for the management and control of all Los Angeles juvenile hall facilities. They were responsible for the care and custody of all youth housed in the juvenile hall facilities. They are sued in their individual capacities for damages under federal law.

17.    Plaintiffs are unaware of the true names and capacities of those Defendants named herein as DOE Defendants. Plaintiffs are informed and believe that Defendants DOES 1 through 20, inclusive, were employees of the County, including but not limited to managerial employees, supervisory personnel, deputies, and civilian staff of the Department of Probation and/or Department of Mental Health and were at all relevant times acting in the course and scope of their employment and agency. Plaintiffs allege that each of the Defendants named as a "DOE" was in some manner responsible for the acts and omissions alleged herein, and Plaintiffs will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.   STATEMENT OF FACTS

### A.   GENERAL CONDITIONS OF CONFINEMENT & FAILURE TO ENSURE ADEQUATE STAFFING

18.    There is longstanding and widespread consensus that Probation houses youth in squalid, dehumanizing conditions that exacerbate trauma and undermine rehabilitation efforts. Some of these conditions are so severe that they

7

1  rise to the level of serious habitability concerns. Taken as a whole, these
2  conditions demonstrate deliberate indifference to the safety and well-being of
3  juvenile detainees, in violation of their due process right to reasonably safe and
4  humane conditions of confinement.

5      19.   In 2017, the County released a study which acknowledged that all of
6  the juvenile hall facilities were "run down" and in need of "repairs, renovations
7  and, remodeling." The study found that conditions at both CJH and BJN "did not
8  facilitate youth rehabilitation." The problems at CJH were so extensive the study
9  recommended closing CJH for complete renovation "to create a human and
10 therapeutic environment."

11     20.   DMH has also recognized that both the condition of the facilities, and
12 their physical layout, prevents meaningful rehabilitation. On April 26, 2019,
13 DMH's Director issued a report to the Board of Supervisors addressing the
14 significant deficiencies in the physical design and layout of the juvenile hall
15 facilities: "Current facilities provide environments that are often counter-
16 therapeutic and negate efforts to stabilize and enhance the youth's functional
17 abilities. As a result, the facilities likely contribute to youth irritability and overall
18 behavioral issues…Progress made in treatment is quickly eroded as the youth may
19 be repeatedly triggered and re-traumatized by the environment. Because of a lack
20 of privacy and a therapeutic treatment space, youth are not able to fully participate
21 in treatment."

22     21.   Probation's own report issued on May 24, 2019, confirmed that "[t]he
23 conditions in which youth reside and staff work are not rehabilitative in nature and
24 may exacerbate or actually induce trauma. For example, the units are linear in
25 design, have hardened furniture and lack art and non-institutional feel in living
26 units and in the common areas." Probation characterized the living units as "cold"
27 and "institutional."

28

22.     During its recent investigation, the Attorney General found that "the size, configuration of the Juvenile Halls' unit space, bleak environment, and lack of stimulation adversely impacts the ability to properly supervise, maintain safe space, and promote meaningful engagement between youth and staff, to the detriment of the delivery of effective programming, group work, and trauma informed behavioral services." The Attorney General's site investigation found that the juvenile halls lacked adequate lighting, proper ventilation, and temperature controls. At BJN, the Attorney General observed food on the floors, thick layers of dirt on the ceiling vents, graffiti on windows, and cockroaches and spiders in youth's living units. At both facilities, most youth's bedrooms were bare. There were no mirrors, no space for personal items such as toiletries or clothing, except under the bed, and no desks or chairs to study. The only exceptions were several specialized housing units (e.g. BJN Girls Hope Center and CJH's Enhanced Supervision Units).

23.     Severe staffing shortages have had a direct bearing on the unconstitutional conditions to which youth are subjected. The Attorney General's report found that, due to the number of staff absent due to calling in sick or disability leave, the juvenile halls lack sufficient staff to carry out overall facility operations and programming, and to ensure the safety and security of staff. The investigation also found that staffing shortages had so significantly affected staff health and morale that it had, in turn, undermined the safety and well-being of the youth for whom they were responsible. As a result of staffing problems, both facilities had higher numbers of new staff who lacked the training and expertise to effectively communicate to youth and de-escalate problems before they became serious.

24.     The Attorney General's investigation found that the County has not developed a system for recruiting staff with sufficient expertise in working with youth with mental illness, commitment to youth development, and language skills.

Probation also maintains a policy of assigning the least experienced new hires to the juvenile halls before they can be promoted to juvenile camps or adult field services, resulting in some staff who are not equipped to work with juvenile detainees.

### 1. Inhabitable Conditions: Failure to Provide Warm Bedding, Restrooms, Sufficient Clean Clothing, Private Showers and Sanitary Food

25.     At both juvenile hall facilities, the County has failed to provide youth with sufficient blankets and clothing to keep warm at night. The Attorney General's investigation found that Probation staff sometimes deny extra bedding during cold nights as a form of punishment, retaliation and control. The investigation also found that youth were not permitted to keep their pants on at night. To keep warm, they had to wear their sweatshirts as pants. Long-johns are provided to some youth at CJH, but they are not available to all youth.

26.     At CJH, youth have no bathrooms in their bedrooms. If they need to use the restroom at night, they must request permission from staff. When probation staff do not respond promptly enough, they are forced to relieve themselves in their cells. Youth have reported to the Attorney General's office that some staff are slow to respond to their need to use the bathroom at night. Some have resorted to saving milk cartons to use in the middle of the night. If they have no milk cartons, youth must bunch up a towel or item of clothing to urinate on. These conditions are particularly traumatizing for teenage girls during the menstrual cycle. There are also instances of youth being forced to defecate in their cells because they have no bathroom access.

27.     Both facilities fail to consistently provide youth with clean clothing, particularly underwear, instead providing either used/dirty underwear, or in some cases, disposable underwear that is rough and uncomfortable. Both halls likewise provide poor quality toiletries that are not culturally specific. Instead of providing

shampoo, conditioner and body wash/soap, the juvenile halls provide an all-in-one product that is not adequate for youth with longer hair.

28.     The juvenile halls have failed to ensure adequate privacy for youth when using the showers and toilets as required by PREA (28 C.F.R. §115.315(d)). PREA privacy curtains were not installed in all units. In other units, curtains had been installed incorrectly or had been removed. Moreover, the Attorney General found that probation staff commonly failed to announce their gender when entering a housing unit, risking youth privacy.

29.     The Attorney General's investigation found that youth often receive cold or unappetizing meals, including meals with worms. The facilities do not provide substitute meals or snacks between meals. At CJH, youth complained that staff deny additional food servings as a form of punishment, retaliation and control. At both halls, youth reported being denied water or punished for drinking water without permission. Youth must have permission to approach drinking fountains and staff are slow to respond to requests for water during the night.

### 2.   Failure to Provide Minimally Required Recreation & Programming

30.     The County regularly fails to provide youth access to legally required programming, exercise, recreation and religious services.

31.     The BSCC 's February 2021 report found both juvenile hall facilities failed to comply with the legal requirement to "provide the opportunity for programs, recreation, and exercise a minimum of three hours a day during the week and five hours a day each Saturday, Sunday, or other non-school days, of which one hour shall be an outdoor activity, weather permitting." Records from both CJH and BJN failed to confirm what scheduled programming activities actually occurred and whether youth attended them. Due to staffing shortages, outdoor recreation was routinely modified to indoor recreation for reasons other than weather.

32.     The Attorney General recently identified similar concerns, reporting that, for the period for which records were produced, CJH provided outdoor recreation only occasionally, and for about 30 minutes per session instead of the full required hour. Probation staff at BJN denied outdoor recreation to some housing units for stretches as long as several weeks, and when they did provide outdoor recreation, they provided it only 30-45 minutes.

33.     The Attorney General's investigation concluded that staffing shortages were directly responsible for the failure to consistently provide recreation, programming, outdoor exercise, and religious services.

### 3.   *Access to Communication/Families/Attorneys*

34.     Probation unreasonably restricts access to phones for communication with families and attorneys. Youth receive only one free call a week, which may range from 5 – 20 minutes. A second call is at the discretion of staff. Most youth are required to call collect for any call beyond their single free call. Second calls are cost prohibitive for many youth. This policy interferes with a youth's right to counsel. Youth report that, in using their one free call, they are forced to choose between calling their families or their lawyers.   This policy also conflicts with a key part of the stated purpose of the juvenile justice system, which is "to preserve and strengthen [a] minor's family ties whenever possible."  (Cal. Welf. & Inst. Code, § 202(a)).

### B.   EXCESSIVE USE OF MECHANICAL RESTRAINTS

35.     California Welfare & Institutions Code § 210.6 prohibits mechanical restraints during transportation except "upon a determination made by the probation department, in consultation with the transportation agency, that the mechanical restraints are necessary to prevent physical harm to the juvenile or another person or due to a substantial risk of flight." (Welf. & Inst. Code, § 210.6.). Title 15 Cal. Code of Regs. §1358.5(c) likewise requires an individual assessment of the need to apply restraints for movement or transportation that

includes consideration of less restrictive alternatives, consideration of a youth's known medical or mental health conditions, trauma informed approaches, and a process for documentation and supervisor review and approval. The individualized assessment is to be made based on facts about the particular youth – and not simply the fact that they are undergoing transfer proceedings or are charged with a serious offense.

36.     The Attorney General's investigation revealed a uniform practice of shackling youth during transportation based solely on youth's charges, with no individualized determinations. The BSCC's February 2021 inspection confirmed this finding, observing that the County failed to document the circumstances leading to the application of mechanical retrains in movement and transportation within the facility. As a matter of across-the-board practice, CJH and BJN violated the statutory requirement to conduct "an individual assessment of the need to apply restraints for movement or transportation that includes consideration of less restrictive alternatives, consideration of a youth's known medical or mental health conditions, trauma informed approaches and a process for documentation and supervisor review and approval."

37.     Shackles are also used indiscriminately and without individualized determination for BJN youth assigned to the "Compound" when they are transported *within* the facility, including when they are transported to attorney visits.

38.     It is widely recognized that mechanical restraints can be harmful to juveniles. They can traumatize or retraumatize youth, especially those with histories of abuse. Youth with pre-existing mental health conditions face even higher risks when subjected to these restraints, especially when those risks are unknown or disregarded by staff. Given that many youth in the juvenile halls have experienced serious trauma in their lives, and more than 90% have an open mental

health case with DMH, they are particularly vulnerable to the harms of mechanical restraints.

### C. UNLAWFUL USE OF ROOM CONFINEMENT (SOLITARY CONFINEMENT IN A LOCKED ROOM)

39. Social isolation is inherently punishing. There is consensus among experts in adolescent mental and physical health that solitary or room confinement – placement in a locked room with minimal contact with people other than facility staff – is deeply harmful to youth. As the American Academy of Child and Adolescent Psychiatry has stated, "[t]he potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis. Due to their developmental vulnerability, juvenile offenders are at particular risk of such adverse consequences."[5]

40. California Welfare and Institutions Code § 208.3 provides that room confinement shall not be used until other less restrictive options have been attempted and exhausted and shall not be used to the extent that it compromises a youth's mental or physical health. Under California law, youth may be held up to four hours in room confinement. After four hours, staff must either return the youth to the general population or obtain authorization from the facility superintendent for further confinement. In addition, staff must consult with medical health or medical staff and/or develop an individualized plan with goals to return the youth to the general population. California law provides that room confinement cannot be used for the purpose of punishment, coercion, convenience, or retaliation.

41. There is a long history of efforts to end room confinement within the County juvenile justice system. On May 3, 2016, the Los Angeles County Board of Supervisors passed a motion to ban the use of room confinement. Pursuant to

---

[5] American Academy of Child & Adolescent Psychiatry, Juvenile Justice Reform Committee, Solitary Confinement of Juvenile Offenders (Apr. 2012)

the motion, the County converted units designated for room confinement to spaces designed for short-term intervention that would permit youth to stabilize before return to the general population. These units are referred to as Healing Opportunities and Positive Engagement Centers (HOPE Centers). A formal inspection report issued on October 4, 2017, however, found that the HOPE Centers were still being used for room confinement, inconsistent with the Board's previous directive to ban room confinement.

42.     The Attorney General's investigation confirmed that excessive and unreasonable use of room confinement remained pervasive through 2019. Based on a review of CJH records from December 2018 – June 7, 2019, the Attorney General found that the County continued to use room confinement in HOPE Centers to punish youth for relatively minor infractions including "disruptive behavior," and "out-of-bounds."  CJH records revealed that the County routinely confined youth for longer than four hours without consulting with medical or mental health staff and/or developing a reintegration plan, and without documenting the reasons for confinement beyond four hours, superintendent approval for continued confinement, or whether the youth received a hearing before long-term confinement. In the first five months of 2019, as many as 11 youth per month were confined beyond 72 hours; some were confined 100 hours or longer. One youth was confined for 1 month and another for 58 days.

43.     In February 2021, the BSCC likewise confirmed a continuing practice of misusing room confinement. The BSCC inspection determined that both juvenile halls persistently violated California laws governing room confinement. Both CJH and BJN violated Welf. & Inst. Code § 208.3's requirement that "[r]oom confinement shall not be used for the purpose of punishment, coercion, convenience or retaliation by staff." According to the BSCC, the County lacked documentation establishing that youth confined to locked rooms were an "active safety or security threat" The documentation was so deficient that it did not

15

always indicate whether youth had been confined to a locked or unlocked room, preventing any determination as to whether the County complied with laws governing room confinement.  Plaintiff alleges that both juvenile halls continue to violate Welf. & Inst. Code § 208.3.

44.    According to the BSCC inspection, staff at both CJH and BJN failed to document whether they obtained approval from a superintendent or assistant superintendent when youth were confined for prolonged periods exceeding four hours.  CJH likewise failed to document whether supervisors met with youth every 2 hours to determine if they were ready to return to their unit. At both CJH and BJN, the County failed to document whether any statutorily required consultation with mental health or medical staff had occurred for youth confined greater than 4 hours. Both facilities failed to provide documentation showing an individualized plan with goals and objectives for reintegration.

45.    Staffing shortages at both facilities directly contributes to over-reliance on room confinement. As the Attorney General's investigation observed, safety risks increase when youth lack access to required programming and recreation and are forced to remain in a locked cell room or on the unit due to insufficient staffing.

### D.    EXCESSIVE USE OF CHEMICAL FORCE (PEPPER SPRAY)

46.    In February 2019, the County Board of Supervisors followed the vast majority of states, and voted to phase out the use of OC spray ("pepper spray") in the juvenile halls based on a well-documented history of excessive and unlawful application of pepper spray against youth, including routine use of pepper spray for minor offenses.[6] Between 2015 and 2017, the use of pepper spray within the

---

[6]  Despite the vote to phase out OC Spray, the Board of Supervisors has not provided full funding for the plan and many of the changes have not moved forward.  *E.g.*, County of Los Angeles Department of Auditor-Controller, Probation Department Juvenile Institutions Costs Savings Review (June 9, 2020),

(cont'd)

juvenile halls increased significantly, despite the fact that probation policy limited its use as the highest level of permissible intervention.  Supervisors were reportedly telling unit staff to "spray first and ask questions later."

47.     In 2019, the Los Angeles County Office of the Inspector General (OIG) issued a report addressing the increase of pepper spray deployment within the juvenile halls. CJH had approximately 267 chemical force incidents in 2017, and 232 in 2018. BJN had 174 documented chemical force incidents in 2017 and 161 in 2018. The OIG reported that probation staff used pepper spray as a tool to gain compliance from youth. Based on use-of-force data from the 2017 – 2018 calendar years, the OIG found that probation staff consistently used pepper spray as an initial or intermediary force option rather than de-escalation strategies. The OIG also reported that staff regularly failed to issue warnings to youth immediately before using pepper spray. Some staff threatened the use of pepper spray as an initial effort to gain compliance, before giving verbal commands.

48.     The Attorney General's investigation similarly revealed a practice and custom of excessive use of chemical force. Youth reported that staff commonly used pepper spray in response to minor misbehavior, often without advance warning.

49.     Video evidence collected and reviewed by Probation's Internal Affairs (IA) Office substantiated reports from youth. IA identified several incidents in which pepper spray had been used despite the absence of an actual or potential threat of harm, characterizing the use of pepper spray as an abusive institutional practice. Probation staff acknowledged that they use pepper spray when youth are "out of bounds" (i.e. out of the permissible area), meaning that staff use pepper spray when youth do not immediately comply with an order to stay in a particular area.

---

Board Agenda Item 10) (Dec. 3, 2020) <https://tinyurl/yd94p8ef> [as of Feb. 13, 2022].

50.     These investigations also revealed that probation staff have sprayed youth with developmental disabilities and mental health conditions, despite probation policy requiring that staff make every effort to avoid deploying OC spray on youth who have a developmental disability or are prescribed psychotropic medication.

51.     Probation staff routinely failed to timely and properly decontaminate youth after deploying pepper spray. The OIG's February 4, 2019 report found that staff failed to timely decontaminate youth. Staff also violated decontamination policies by leaving youth unattended, denying access to water, and using hot or warm water, which exacerbates the effect of OC spray. Until May 2019, the juvenile hall showers lacked any mechanism to use cold water.

52.     Staffing shortages directly contributes to the pervasive use of chemical force. As recognized by the President of the County of Los Angeles Probation Commission in a letter submitted on April 29, 2019, due to staffing shortages caused by absences and disability leave, staff on duty experienced exhaustion and burnout, leaving them stretched too thin in their units. Safety and security risks increase when youth lack access to required programming and recreation and are forced to remain in a locked cell room or on the unit due to insufficient staffing.

53.     High rates of staff turn-over have resulted in increased numbers of relatively new staff who lack the training and experience to de-escalate youth, such that minor incidents are more likely to become explosive. According to the Attorney General's investigation, staff reported that they had not received adequate training on de-escalation, communication, building relationships with youth and trauma-informed care. Especially given the high numbers of new staff, these training deficiencies have left staff unprepared to effectively communicate with youth to avoid force incidents.

### E.   MENTAL HEALTH CARE AND TREATMENT

54.    Staffing shortages have prevented Los Angeles County Department of Mental Health from providing constitutionally adequate mental health services to incarcerated youth. Over 90% of youth detained in CJH and BJN have open mental health cases (i.e. a mental health diagnosis requiring treatment).  Because the average length of stay in juvenile halls is approximately two weeks, short-term psychotherapy focused on stabilizing the youth's symptoms is typically used.

55.    As DMH has acknowledged, staffing limitations have undermined the ability to provide sufficient individual and group mental health treatment, comprehensive ongoing assessment and crisis de-escalation. The Probation Department's practice of assigning the least-experienced new hires to the juvenile halls directly contributes to the inability to provide adequate mental health services. In his April 26, 2019 letter, DMH's director observed that "[p]robation staff in the juvenile halls tend to be the most recently hired in the Department, and in general, have less experience in dealing with youth with mental illness than more seasoned staff…[t]hey typically are not skilled in crisis response and utilizing de-escalation techniques, dialectical behavior therapy (DBT) techniques, or other techniques to defuse situations that could otherwise escalate."

56.    Staffing issues are compounded by limitations presented by the physical design of the juvenile halls. As noted above, on April 26, 2019, DMH issued a report concluding that the physical layout of the juvenile hall facilities was counter-therapeutic and leads to poor mental and emotional functioning in youth.  With regards to insomnia specifically, the DMH Director observed: "The specific causes of insomnia are likely multifactorial and related to relatively early bedtime for age…a noisy, unfamiliar and uncomfortable environment, potentially triggering trauma-related hypervigilance and anxiety; rumination and worry about pending legal issues and ongoing events transpiring in local neighborhoods; and difficulty customizing their environment for sleep."

## V.  PLAINTIFF AGUSTIN HERRERA'S ALLEGATIONS

57.     Mr. Herrera was first detained at CJH for two months in or about 2014.  He was just 12 years old.  He was ultimately detained at CJH and BJN at least four times between 2014-2019.

58.     At both facilities, Herrera was put in rooms that were "nasty" and dirty, with sticky floors, mold, and walls full of graffiti.  His bed was a green mat that was so thin it felt like cardboard.  These mats, and the blankets he was provided, were usually old, reused, and unsanitary.  The temperature at night was often very cold and Plaintiff was not provided with the necessary clothing to keep him warm.  As a result, Plaintiff had difficulty sleeping.

59.     Plaintiff was also forced to wear underwear previously worn by other people.  There were almost always broken and clogged toilets, and the bathrooms were disgusting.  On numerous occasions, at night, he was forced to urinate into a bottle or onto the floor of his room, because the guards would not allow him out of his room in time to use the bathroom.  This was embarrassing for Plaintiff.  His only solace was that this practice was so common at least he was not the only person to endure this indignity.  Indeed, people were forced to urinate and defecate in their rooms so frequently that a terrible smell often permeated the facility. When Plaintiff and others complained, the staff told them that they are criminals and "don't deserve" to use the bathroom.

60.     Plaintiff was pepper sprayed by staff numerous times at both facilities. The first time was when he was 14 years old.  In Plaintiff's experience, pepper spraying at the facility was so frequent that it became "normal."  The staff were aggressive and punitive, and they did not hesitate to use pepper spray as a first option.

61.     Plaintiff was often physically restrained by much bigger staff who seemed to take sadistic pleasure in causing physical and emotional pain.  In one incident, a staff member entered Plaintiff's room, and proceeded to twist his arm

around his back and throw him to the floor, where he placed all of his weight on Plaintiff, causing severe pain.  The supervisor tried to bribe Plaintiff with a hamburger so that he would not report the incident and file a grievance.

62.     In another incident, when Plaintiff did not want to leave his classroom to be put in his room, he was surrounded by seven staff, one of whom told him "fuck your dead grandmother," who had just died.

63.     Plaintiff was thrown into his room or solitary confinement at both facilities for long periods of time due to minor infractions.

64.     Plaintiff, along with everybody else, was shackled every time he left the facility or was transported to court. There were no exceptions to this rule.

65.     Plaintiff was allowed one 5-minute phone call each week.  He would have to choose between calling his mother or his lawyer.  When he chose his mother, he would sometimes be forced to attend court without having had adequate time to speak to his attorney.

66.     Plaintiff was also sometimes prevented from attending church services on Sunday mornings.  Whether you were allowed to attend depended, in large part, on whether the staff liked you or whether they wanted to punish you.

67.     Plaintiff also had difficulty obtaining mental health services. To the extent there were therapists, they were usually busy, and if you did get to see one you were limited to 20 minutes. At CJH, Plaintiff specifically asked for a mental health worker, but his request was denied. At times, he did not even know how to access mental health treatment.  For example, after his grandmother died, he did not receive any counseling. Nor was he allowed to call his mother to grieve.

68.     Plaintiff's experiences at both facilities caused significant physical and emotional pain and trauma; it even changed his personality.  Prior to the first time he was detained, he was not an aggressive or violent person.  But that changed after his first experience, and the damage only compounded each time he was detained.  He also, ultimately, felt "institutionalized" and gradually stopped caring

about his future.

69.     Plaintiff is working hard to overcome this damage and seek the rehabilitation he should have been provided in juvenile hall.  He is currently working, volunteering, and attending school.

## VI.    CLASS DAMAGES ALLEGATIONS

70.     Plaintiff Agustin Herrera brings this lawsuit under 42 U.S.C. §1983, seeking class-wide relief, on behalf of himself and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), who are described in the Damages Classes below.

71.     Plaintiff satisfies the typicality requirement of Rule 23(a)(3) as his claims are typical of the class. As detailed in § IV (above), Plaintiff was detained in both CJH and BJN during the class period. During his detentions, he was subjected to the same conditions and unlawful practices as other class members, including unconstitutional living conditions, deprivation of legally required programming/recreation time, unlawful restraint during transport, unlawful room confinement, excessive force (pepper spray), and lack of access to adequate mental health services. Plaintiff is an adequate class representative who will fairly and adequately protect the interests of the class and understands his responsibilities as a class representative. The proposed class is represented by highly qualified and experienced counsel:  McLane, Bednarski & Litt, LLP and Rapkin & Associates, LLP.  Both firms are highly experienced in complex civil rights litigation, with an emphasis on civil rights class actions, and have extensive experience handling jail matters.

72.     The proposed damages classes, all of which satisfy the criteria of FRCP 23(a), are described below. They are each sufficiently numerous, represented by a plaintiff with typical claims, and present common questions of law and fact.

73.     The classes also satisfy the criteria of FRCP 23(b)(3). Liability for most of the classes hinges on one or more across-the-board policies or practices. Given the significance of the common, class-wide liability questions to the resolution of the claims, common questions predominate over any individual questions, including individual damages questions. The predominance of those issues for each damages class is sufficient to certify the class under Rule 23(b)(3) pursuant to the provisions of F.R.Civ.P 23(c)(4), which authorizes the certification of a class "with respect to particular issues," even if there are other issues to be tried individually.

## A.   PROPOSED DAMAGES CLASSES

### 1.   *Conditions of Confinement Damages Class & Subclasses*

74.     The **Conditions of Confinement Damages Class** is defined as all persons who were born on or after February 15, 2002, continuing until the practice has ceased or until entry of judgment, whichever is sooner, and who have been or will be, in whole or in part, subjected and/or exposed to the following conditions of confinement that have systemically plagued the juvenile facilities for years: inadequate access to bathrooms at night; frequent cold conditions without adequate heat, bedding or pajamas; insufficient blankets, sheets, and mattresses; inadequate and improper clothing including previously worn (i.e. dirty) and/or disposable underwear that itches and is not durable in contravention of regulation and County policy; lack of privacy for showers and toilets, poor quality shampoo and lotion that is inequitably dispensed; unsanitary food; and denial of phone calls, including calls guaranteed by regulation and/or Probation policy. The legal and factual issues common to this class include the conditions under which youth were confined at each facility, and whether the living conditions within the juvenile halls violated the due process rights of detained youth.

75.     While the conditions at CJH and BJN were remarkably similar, Plaintiff defines subclasses corresponding to each of the two facilities to capture

potential difference in conditions: **CJH Conditions of Confinement Subclass** and **BJN Conditions of Confinement Subclass.** The subclasses are defined identically to the main class except that they are limited to individuals housed at each of the two juvenile halls. Some putative class members with more than one detention may belong to both subclasses. Plaintiffs may refine their proposed class definitions based on information that comes to light during the discovery process.

76.     The primary class and subclasses are sufficiently numerous. Although the juvenile hall populations have decreased significantly over the past several years, in any given year several thousand youth are confined to the juvenile halls and subjected to the deprivations and violations of rights described of in this complaint. The current juvenile hall population is greater than 275 youth. For most of the class period, the population was at least 400 – 500 youth.

## 2.     *Programming & Recreation Damages Class*

77.     The **Programming & Recreation Damages Class** is defined as all persons who were born on or after February 15, 2002, continuing until the practice has ceased or until entry of judgment, whichever is sooner, and who have been or will be, in whole or in part, unlawfully deprived of programming, outdoor recreation, and/or religious services during their detention at either CJH or BJN. The legal and factual issues common to the class include whether the County's failure to provide legally required programming, outdoor recreation and/or access to religious services violated the rights of youth confined to the juvenile halls. The class is sufficiently numerous given the population of the juvenile halls over the class period and pervasive failure to ensure access to programming and recreation in each of the facilities.

## 3.     *Mechanical Restraint Damages Class*

78.     The **Mechanical Restraint Damages Class** is defined as all persons who were born on or after February 15, 2002, continuing until the practice has ceased or until entry of judgment, whichever is sooner, and who have been or will

be, in whole or in part, subjected to the unlawful use of mechanical restraints during their detention in either CJH or BJN. The legal and factual issues common to the class include whether the County maintained a uniform practice of restraining youth with using mechanical restraints for transportation and/or movement within the facilities, without individualized determinations, and whether such indiscriminate use of mechanical restraints violated the rights of youth confined to the juvenile halls. The class is sufficiently numerous given the population of the juvenile halls over the class period and the widespread practice of restraining youth during transportation.

#### 4. *Room Confinement Damages Class*

79.     The **Room Confinement Damages Class** is defined as all persons who were born on or after February 15, 2002, continuing until the practice has ceased or until entry of judgment, whichever is sooner, and who have been or will be, in whole or in part, subjected to the unlawful, solitary room confinement greater than four hours during their detention in either CJH or BJN. The legal and factual issue common to the class include whether the County maintained unconstitutional policies, customs and practices with regard to the use of room confinement/solitary confinement within the juvenile hall facilities and/or failed to adequately supervise, train or discipline Probation Staff in the use of solitary confinement detained youth. The classes are sufficiently numerous in light of records showing numerous prolonged room confinements each month during the class period.

#### 5. *Excessive Use of Chemical Force (Pepper Spray)*

80.     The **Chemical Excessive Force Damages Class** is defined as all youth who were born on or after February 15, 2002, continuing until the practice has ceased or until entry of judgment, and who were subjected to the unlawful and inappropriate use of pepper spray within the juvenile hall facilities. The factual and legal questions common to the class are whether the County maintained

unconstitutional policies, customs and practices with regard to the use of pepper spray within the juvenile hall facilities and/or failed to adequately supervise, train or discipline Probation Staff in the use of pepper spray against detained youth. The classes are sufficiently numerous given records showing hundreds of chemical force incidents each year through at least 2018.

### 6. *Mental Health*

81.     The **Mental Health Damages Class** is defined as all youth who were born on or after February 15, 2002, continuing until the practice has ceased or until entry of judgment, and who were detained in either CJH or BJN, received a mental health diagnosis, and were deprived of constitutionally adequate mental health services including but not limited to prompt and thorough intake assessment, access to mental health professionals and adequate group and/or individual therapy sessions. The legal and factual questions common to the class include whether the County provided constitutionally adequate mental health services to detained youth.  This class satisfies the FRCP 23(a) numerosity requirement as greater than 90% of youth confined to juvenile halls have active mental health cases.

## VII.   CAUSES OF ACTION

**A.     FIRST CAUSE OF ACTION: §1983 DUE PROCESS VIOLATION ARISING FROM DEHUMANIZING CONFINEMENT CONDITIONS AMOUNTING TO PUNISHMENT AND REFLECTING DELIBERATE INDIFFERENCE TO THE BASIC NEEDS OF DETAINED YOUTH**

**(Against County of Los Angeles, Los Angeles County Probation Department, Probation Department Defendants, and DOES 1-20)**

82.     Plaintiff incorporates the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

83.     Acting under color of state law, Defendants have violated Plaintiff's and similarly situated youth's due process rights pursuant to the Fourteenth Amendment to the United States Constitution by maintaining policies, practices

and customs that subjected youth to inhumane, unsafe, and punitive living conditions within the juvenile halls.

84.     Juvenile detentions are "noncriminal and nonpenal." *Gary H Hegstrom*, 831 F.3d 1430, 1432 (9th Cir. 1987). Juveniles confined to a juvenile correctional facility have a constitutional right to reasonably safe conditions of confinement, freedom from unreasonable bodily restraint, and meaningful recreation opportunities. Juvenile detainees have a right to be free from conditions that amount to punishment and/or reflect deliberate indifference to their basic needs.

85.     The dehumanizing living conditions within the Los Angeles County juvenile halls are inherently punitive and inflicted harms upon detained youth that are independent from and/or exceed the inherent discomforts of confinement. The Los Angeles County Probation Department maintained policies, practices and customs that deprived youth confined to the juvenile halls of access to bathrooms at night (requiring them to relieve themselves in their bedrooms using cartons, bottles, towels or clothing), warm bedding, warm pajamas, clean and adequate underwear, sanitary food, privacy when using the toilet and shower, and minimally required access to outdoor recreation, programming and religious services. These deprivations are often inflicted as a form of control, punishment and retaliation. None of these harms are inherent to the necessary discomforts of confinement, and none serve a legitimate government purpose. To the contrary, there is broad consensus that the dehumanizing conditions of confinement exacerbate trauma and undermine rehabilitation efforts.

86.     Deprivation of bathroom access, bathroom privacy, shower privacy, warm bedding, sufficient clothing, sanitary food, and outdoor recreation also reflect deliberate indifference to the basic human needs and mental health condition of detained youth. As the County's Department of Mental Health has acknowledged, more than 90% of detained youth have a diagnosed psychiatric

27

condition requiring mental health treatment. The inhumane living conditions are psychologically detrimental, triggering to youth with histories of abuse and trauma, and may directly contribute to insomnia and other disorders, directly impacting the psychological and well-being of detainees. The County's persistent failure to improve living conditions within the juvenile halls demonstrates deliberate indifference to the mental health needs of juvenile detainees and to a substantial risk of deteriorating psychiatric conditions, as well as extreme and unnecessary anguish and suffering.

87.   California Code of Regulations, title 15, section 1390 prohibits the deprivation of bed and bedding; daily shower; access to drinking water; toilet and personal hygiene items, and clean clothing; full nutrition; contact with parent or attorney; exercise; religious services; clean and sanitary living conditions; and rehabilitative programming as a form of discipline.

88.   Defendants, including supervisory DOE defendants, similarly failed to ensure appropriate staff training, supervision, and discipline with regard to youth living conditions. Defendants, including DOES 1-20 knew, or in the exercise of reasonable care, should have known, of a pattern and custom of depriving detained youth of access to bathrooms, appropriate bedding, necessary clothing, sanitary food, privacy, and minimally required recreation time, religious services and programming. Despite this knowledge, Defendants failed to investigate, train, supervise and discipline Probation Staff to prevent harm to Plaintiff and other similarly situated youth.

89.   Supervisory defendants, including Probation Department Defendants and supervisory DOE defendants, failed in their authority as supervisory personnel to maintain appropriate procedures for ensuring constitutionally adequate conditions of confinement; to train and instruct subordinates to ensure constitutionally adequate conditions; to ensure proper supervision of Probation Staff responsible for the living conditions of youth; to ensure necessary

documentation with regard to conditions of confinement, including with regard to recreation, programming and religious services. Each supervisory defendant is liable on the basis that they were either personally involved in the violation of Plaintiff or similarly situated youth's rights, or there was a sufficient causal connection between their wrongful conduct and the violation of youth detainees' rights.

90.     As a result of the violations alleged herein, Plaintiff and similarly situated youth experienced physical, emotional and mental harm, and general and/or special damages. Plaintiff seeks all available damages remedies, including but not limited to compensation for actual damages, special and general damages, and statutory damages.

**B.     SECOND CAUSE OF ACTION: §1983 DUE PROCESS VIOLATION - USE OF MECHANICAL RESTRAINTS**

**(Against County of Los Angeles, Los Angeles County Probation Department, Probation Department Defendants, and DOES 1-20)**

91.     Plaintiff incorporates the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

92.     Acting under color of state law, Defendants have violated Plaintiff's and similarly situated youth's due process rights pursuant to the Fourteenth Amendment to the United States Constitution by maintaining policies, practices and customs that resulted in the excessive and unreasonable use of mechanical restraints. .

93.     Juveniles confined to a juvenile correctional facility have a constitutional right to reasonably safe conditions of confinement, including the right to be free from unreasonable bodily restraints. The indiscriminate use of mechanical restraints for transportation and movement of youth within the BJN "Compound" was inherently punitive and resulted in harm that exceeded the inherent discomforts of confinement. The indiscriminate use of mechanical

restraints was an excessive and therefore unconstitutional response to the safety needs of the Probation Department.

94.     The Los Angeles County Probation Department has maintained an unconstitutional practice and custom of excessive and unreasonable shackling of youth during transportation and movement, without conducting legally required, individualized determinations regarding the potential for physical harm or flight risk. This practice violated the due process rights of all youth subjected to unreasonable and unjustified bodily restraints.

95.     The Probation Department's unconstitutional, uniform policy of shackling youth during transportation also reflects deliberate indifference to a substantial risk of harm, particularly to youth who face medical or psychiatric risks from mechanical restraints. It is widely understood that mechanical restraints can have an adverse impact on youth, especially those with mental illness or histories of trauma.

96.     The Probation Department has similarly failed to ensure appropriate staff training, supervision, and discipline with regard to shackling. Defendants knew, or in the exercise of reasonable care, should have known, of practices and customs that resulted in indiscriminate shackling of youth without individualized determinations. Despite this knowledge, Defendants failed to investigate, train, supervise and discipline Probation Staff to prevent harm to Plaintiff and other similarly situated youth.

97.     As a result of the violations alleged herein, Plaintiff and similarly situated youth experienced physical, emotional and mental harm, and general and/or special damages. Plaintiff seeks all available damages remedies, including but not limited to compensation for actual damages, special and general damages, and statutory damages.

### C. THIRD CAUSE OF ACTION: §1983 DUE PROCESS VIOLATION – UNLAWFUL SOLITARY CONFINEMENT (ROOM CONFINEMENT)

**(Against County of Los Angeles, Los Angeles County Probation Department, Probation Department Defendants, and DOES 1-20)**

98.    Plaintiff incorporates the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

99.    Acting under color of state law, Defendants have violated Plaintiff's and similarly situated youth's due process rights pursuant to the Fourteenth Amendment to the United States Constitution.  Defendants engaged in a pattern and practice of excessive, unreasonable, and punitive use of solitary confinement, not justified by an active safety or security threat. As documented by the California Attorney General and BSCC, the Probation Department has maintained a practice of using solitary confinement for relatively minor infractions rather than active, legitimate security threats, and of relying on solitary confinement for convenience, punishment and coercion.

100.    The use of social isolation is inherently punishing and supports no disciplinary or therapeutic benefit. For this reason, except where when warranted by an active safety or security threat, the use of solitary confinement for juvenile detainees constitutes punishment and violates Due Process. The County's isolation and room confinement practices constituted an excessive and therefore unconstitutional response to the safety needs of the juvenile halls.

101.    Defendants similarly failed to ensure appropriate staff training, supervision, and discipline with regard to room confinement. As a matter of practice, the Probation Department routinely subjects youth to prolonged room confinement of longer than four hours without securing appropriate supervisory approval, consulting with medical and/or mental health staff, documenting the reasons for prolonged confinement, or developing required re-integration plans. Defendants maintained grossly inadequate procedures for supervising,

31

investigating, reviewing and disciplining probation officers for misuse of room confinement.

102.   The failure to end excessive use of room confinement reflects a deliberate indifference to a substantial risk of harm to youth. There is broad consensus that the practice of room confinement and solitary confinement places children at great risk of permanent physical and psychiatric harm. The disregard for these harms is underscored by the persistent failure to consult with medical and mental health staff when confining youth for more than four hours, as required by California law.

103.   As a result of the violations alleged herein, Plaintiff and similarly situated youth experienced physical, emotional and mental harm, and general and/or special damages. Plaintiff seeks all available damages remedies, including but not limited to compensation for actual damages, special and general damages, and statutory damages.

**D.   FOURTH CAUSE OF ACTION: §1983 FOURTH AMENDMENT & FOURTEENTH AMENDMENT DUE PROCESS VIOLATION – EXCESSIVE USE OF CHEMICAL FORCE**

**(Against County of Los Angeles, Los Angeles County Probation Department, Probation Department Defendants, and DOES 1-20)**

104.   Plaintiff incorporates the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

105.   Defendants subjected Plaintiff and similarly situated youth to excessive, unreasonable, and punitive use of force by routinely deploying pepper spray in response to minor infractions, as an initial or intermediary force option, and as a tool to gain behavioral compliance. The Probation Department's use of pepper spray constituted an excessive and therefore unconstitutional response to the security needs of the juvenile halls.

106.   Defendants maintained the following unconstitutional customs, practices and policies with regard to chemical force:

32

A. Excessive use of chemical force, including routine use of chemical force for relatively minor infractions and/or to gain compliance;

B. Failing to ensure appropriate warnings before deploying pepper spray;

C. Failing to provide resources to safely decontaminate youth after deploying pepper spray;

D. Providing inadequate training regarding the use of chemical force and decontamination practices following the use of physical force;

E. Employing and retaining probation officers known to have abusive and punitive tendencies with regard to chemical force;

F. Inadequately supervising, training, controlling and disciplining probation officers with known propensities to abuse pepper spray;

G. Sanctioning and promoting a culture of over-reliance on pepper spray to coerce and control youth within the juvenile halls;

H. Maintaining grossly inadequate procedures for reporting, supervising, investigating, and reviewing misconduct by probation officers; and

I. Refusing to discipline, terminate or retrain probation officers involved in incidents of unreasonable and/or excessive use of chemical force.

107.   These policies and customs were a moving force behind the violation of Plaintiff's and similarly situated class members' constitutional rights to be free from excessive force within the juvenile halls.

33

108.   Defendants had either actual or constructive knowledge of the deficient policies, practices and customs alleged here, yet condoned and tolerated such practices.

109.   As a result of the violations alleged herein, Plaintiff and similarly situated youth experienced physical, emotional and mental harm, and general and/or special damages. Plaintiff seeks all available damages remedies, including but not limited to compensation for actual damages, special and general damages, and statutory damages.

**E.   FIFTH CAUSE OF ACTION: §1983 DUE PROCESS VIOLATION ARISING FROM DELIBERATE INDIFFERENCE TO PLAINTIFF'S SERIOUS MENTAL HEALTH CONDITIONS (VIOLATION OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION)**

**(Against Los Angeles County, Los Angeles County Probation Department, Probation Department Defendants, Los Angeles County Department of Mental Health, and DOES 1-20)**

110.   Plaintiff incorporates the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

111.   Under the Fourteenth Amendment to the United States Constitution and laws of the United States, detained youth are entitled to constitutionally adequate mental health treatment during the confinement to juvenile detention facilities. Acting under color of state law, Defendants and DOES 1 through 20, and each of them, caused violations of Plaintiff's due process rights pursuant to the Fourteenth Amendment to the United States Constitution.

112.   Defendants acted with deliberate indifference to the serious mental health needs of youth confined to the juvenile halls by failing to provide sufficient assessments, sufficient individual and group mental health treatment, comprehensive ongoing assessment and crisis de-escalation. Defendants similarly failed to provide an environment conducive to psychiatric treatment by confining

34

youth to living environments with squalid and retraumatizing conditions that exacerbated their mental health conditions undermined therapeutic progress.

113.   On information and belief, as a result of inadequate mental health services, youth with mental health conditions were significantly more likely to be subjected to room confinement and/or chemical force.  Despite probation policy requiring staff to avoid deploying pepper spray on youth who are prescribed psychotropic medication, investigations conducted by the Attorney General's office, OIG and IA found that pepper spray had been used on youth with serious mental health conditions requiring psychotropic medication.

114.   As a result of the violations alleged herein, Plaintiff and similarly situated youth experienced physical, emotional and mental harm, and general and/or special damages. Plaintiff seeks all available damages remedies, including but not limited to compensation for actual damages, special and general damages, and statutory damages.

**F.   SIXTH CLAIM FOR RELIEF: VIOLATIONS OF THE AMERICANS WITH DISABILITY ACT, TITLE II, 42 U.S.C. §12101 ET SEQ., THE REHABILITATION ACT, 29 U.S.C. §794**

**(Against Los Angeles County, Los Angeles County Probation Department, Probation Department Defendants, Los Angeles County Department of Mental Health, and DOES 1-20)**

115.   Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

116.   Plaintiff and others similarly situated are "qualified individual[s]," with mental impairments that substantially limited their ability to care for themselves and control their mental, medical or physical health condition as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. §12131 (2), under Section 504 of the Rehabilitation Act of 1973 (RH), and 29 U.S.C. §794, and as qualified individuals with a disability, Plaintiff and similarly situated individuals

1   met the essential eligibility requirements of the Probation Department's and

2   Department of Mental Health's programs to provide mental/medical health care

3   services for youth detainees in the juvenile halls.

4        117.   Los Angeles County's juvenile halls are places of public

5   accommodation. CJH and BJN are covered entities for purposes of enforcement of

6   the ADA, 42 U.S.C. §12131 (2), under Section 504 of the Rehabilitation Act of

7   1973, and Cal. Civ. Code §51, seq., explicated by the regulations promulgated

8   under each of these laws.

9        118.   Under the ADA, the County of Los Angeles is mandated to "develop

10  an effective, integrated, comprehensive system for the delivery of all services to

11  persons with mental disabilities and developmental disabilities. . ." and to ensure

12  "that the personal and civil rights" of persons who are receiving services under its

13  aegis are protected.

14       119.   The County of Los Angeles is mandated under the ADA not to

15  discriminate against any qualified individual on the basis of disability in the full

16  and equal enjoyment of the goods, services, facilities, privileges, advantages, or

17  accommodations of any place of public accommodation." 42 U.S.C. §12182 (a).

18       120.   Defendant County of Los Angeles receives federal financial assistance

19  for its juvenile halls, and therefore must comply with the mandates of the

20  Rehabilitation Act, §504, which specifies that "program or activity" means all of

21  the operations of … A department, agency, special purpose district, or other

22  instrumentality of a State or of a local government.

23       121.   Defendant County of Los Angeles violated the ADA and the

24  Rehabilitation Act and deprived Plaintiff and similarly situated individuals of their

25  federally protected rights by:

26        (a) failing to provide services or accommodate youth with mental health

27            conditions with access to the programs and services to enable youth with

28            disabilities to participate on an equal basis in programs, services and

36

activities;

(b) failing to provide services or accommodate Plaintiff and youth with mental health disorders with appropriate classification, housing, freedom from unreasonable bodily restraint, freedom from unreasonable room confinement, and freedom from excessive chemical force, for individuals in their sole and exclusive custody who they knew suffered from serious mental health conditions;

(c) Failing to develop and enforce procedures for the Probation Department and Department of Mental Health to ensure provision of necessary accommodations, modifications, services and/or physical access necessary to enable youth with disabilities to participate on an equal basis in programs, services and activities.

(d) failing to properly train probation staff, on how to peacefully respond, treat, and interact with disabled persons, such as Plaintiff; and

(e) failing to provide sufficient individual and group mental health treatment, comprehensive individual and ongoing assessment, and effective crisis de-escalation.

122.   Plaintiff and similarly situated individuals were denied the benefits of the services, programs, and activities of County of Los Angeles which deprived them of mental health and medical health programs and services which would have provided the delivery of treatment, follow-up and supervision. This denial of programs and services was the result of Plaintiff's disability in that he was discriminated against because he was mentally ill. Defendants' failure to train their employees, and the denial of health treatment, follow-up, training, and supervision resulted in the violation of Plaintiff's constitutional rights.

123.   As a result of the violations alleged herein, Plaintiff and similarly situated youth experienced physical, emotional and mental harm, and general and/or special damages. Plaintiff seeks all available damages remedies, including

1   but not limited to compensation for actual damages, special and general damages,

2   and statutory damages.

3

4   **VIII.  <u>PRAYER FOR RELIEF</u>**

5           WHEREFORE, Plaintiff, on behalf of himself and the class members he

6   represents, requests the following relief:

7           1.      General and special damages according to proof;

8           2.      Attorneys' fees and costs under 42 U.S.C. §1988, 42 U.S.C. §12205,

9   29 U.S.C. §794a, and whatever other statute or law may be applicable; and

10          3.      Any such other relief as the Court finds just and proper.

11  Dated:  February 14, 2022              Respectfully submitted,

12                                          McLane, Bednarski & Litt, LLP
                                            Rapkin & Associates, LLP

13

14

15                                          By:  _/s/ Barrett S. Litt_____
                                                   Barrett S. Litt
16

17

18                                  **<u>JURY DEMAND</u>**

19

20      Trial by jury of all issues is demanded.

21  Dated:  February 14, 2022              Respectfully submitted,

22                                          McLane, Bednarski & Litt, LLP
                                            Rapkin & Associates, LLP
23

24                                          By:  _/s/ Barrett S. Litt_____
                                                   Barrett S. Litt
25

26

27

28

38