BARRETT S. LITT, SBN 45527
blitt@mbllegal.com
LINDSAY BATTLES, SBN 262862
lbattles@mbllegal.com
MᴄLᴀɴᴇ, Bᴇᴅɴᴀʀsᴋɪ & Lɪᴛᴛ, LLP
975 E. Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

SCOTT B. RAPKIN, SBN 261867
E-Mail: scottrapkin@rapkinesq.com
MICHAEL S. RAPKIN, SBN 67220
E-Mail: msrapkin@gmail.com
RAPKIN & ASSOCIATES, LLP
475 Washington Blvd.
Marina del Rey, California 90292
Telephone: (310) 319-5465
Facsimile: (310) 319-5355

Attorneys for Plaintiff AGUSTIN HERRERA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUSTIN HERRERA, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.<br><br>    Defendants. | Case No. 2:22-cv-01013-HDV-PDx<br><br>[Honorable Hernan D. Vera]<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**Date: January 28, 2026**<br>**Time: 10:00 A.M.**<br>**Ctrm: 5B** |

1    TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that, on January 28, at 10:00 a.m., or as soon

3    thereafter as this matter may be heard in Courtroom 5B of the United States

4    District Court for the Central District of California, 350 West First Street, Los

5    Angeles, California 90012, Plaintiff will, and hereby does, move the Court to grant

6    final approval to the classwide settlement in this matter.

7         This motion is based on the accompanying Memorandum of Law, the

8    settlement terms as reflected in the previously filed settlement agreement (Exhibit

9    A to Plaintiff's Motion for Preliminary Approval of Settlement Dkt. 63-2), the

10    declarations and exhibits filed in connection with this motion, the files and records

11    in this case, and on such further evidence as may be presented at a hearing on the

12    motion.

13

14    DATED: December 29, 2025    Respectfully submitted,

15         McLane, Bednarski & Litt, LLP

16

17    By: */s/ Barrett S. Litt*
18    Barrett S. Litt
     Attorneys for Plaintiffs

19

20    By: */s/ Lindsay Battles*
     Lindsay Battles
21    Attorneys for Plaintiffs

22    Rapkin & Associates

23

24    By: */s/ Scott Rapkin*
     Scott Rapkin
25    Attorneys for Plaintiffs

26

27

28

1

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................... 1

II.   FINAL APPROVAL STANDARD UNDER FRCP 23(E) ............................. 3

III.  THE PROPOSED SETTLEMENT IS FAIR REASONABLE AND
      ADEQUATE........................................................................................... 3

      A.  THE SETTLEMENT PROVIDES ADEQUATE RELIEF TO CLASS MEMBERS ....... 3

          1.  Individual Recoveries Represent an Excellent Outcome Considering
              the Costs, Risks and Delay of Trial and Appeal ................................. 4

          2.  The Settlement Employs a Fair & Effective Means of Distributing
              the Settlement to Class Members............................................................ 9

          3.  The Court Will Decide a Fair and Reasonable Fee ........................... 11

          4.  The Settlement is Fair and Reasonable to Minors .............................. 12

      B.  ADEQUACY OF REPRESENTATION ................................................................. 12

      C.  EQUITABLE TREATMENT OF CLASS MEMBERS ......................................... 15

      D.  ARMS-LENGTH NEGOTIATIONS ................................................................... 16

      E.  THERE WERE NO OBJECTIONS ..................................................................... 16

      F.  LATE CLAIMS ................................................................................................. 16

IV.  CONCLUSION ....................................................................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alberto v. GMRI, Inc.*,
  2008 WL 4891201 (E.D. Cal. Nov. 12, 2008)........................................................12

*Amador v. Baca*,
  2017 WL 9472901 (C.D. Cal. June 7, 2017) .........................................................7

*Boone v. City of Philadelphia*,
  668 F. Supp. 2d 693 (E.D. Pa. 2009) .....................................................................9

*Carlin v. DairyAmerica, Inc.*,
  380 F. Supp. 3d 998 (E.D. Cal. 2019) ..................................................................16

*Hardy v. D.C.*,
  49 F. Supp. 3d 48 (D.D.C. 2014) ............................................................................9

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F. 3d 935 (9th Cir. 2011) ...............................................................................11

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) .........................................................................16

**Rules**

Federal Rule of Civil Procedure 23(b)(3)..................................................6, 7, 8, 12

Federal Rule of Civil Procedure 23(e)(2) ........................................................3, 12

Federal Rule of Civil Procedure 23(e)(3) ..............................................................3

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

Class Counsel seeks final approval of the settlement in this § 1983 class action challenging deplorable conditions of confinement in Los Angeles County's three juvenile halls and various camps. The total size of the non-reversionary settlement fund is $30,000,000, from which attorneys' fees, class administration costs ($163,000), the incentive/service award ($25,000), and litigation costs ($85,960) will be taken, with the remaining funds to be distributed among claiming class members. Assuming a 30% fee award (the amount Plaintiffs' counsel have requested in the fee motion), this results in approximately $20,726,239 to be distributed to class members.[1]

Each class member's recovery represents compensation for their exposure to illegal and inherently punitive conditions within the juvenile halls and juvenile camps. These conditions include lack of overnight bathroom access; insufficient clean/warm bedding and clothing; excessive use of pepper spray; excessive use of room confinement; illegal shackling during transportation; and inconsistent access to rehabilitation programming and outdoor recreation. These conditions were entirely unsupported by safety or rehabilitation purposes and therefore violated the Fourteenth Amendment Due Process rights of detained youth. The squalid and abusive conditions significantly exacerbated the mental health conditions of detained youth, undermining their therapeutic progress. From a mental health perspective, the conditions were so egregious and retraumatizing that they reflected deliberate indifference to the mental health needs of detained youth. Notably, this case does <u>not</u> release any claims for sexual abuse or physical abuse aside from the use of pepper spray (and expressly does not include gladiator fights).

---

[1] The agreement expressly provides that the settlement is non-reversionary. All of the Class Fund available for distribution to the class will be distributed to class members based upon the distribution formula explained *infra*. None of the Class Fund shall revert to Los Angeles County in any form.

1

Depending on the outcome of the fee motion, counsel estimates that the settlement will result in a distribution of over $20,726,000 to claimants. The average (mean) award is $13,286.05; the median award is $5,307.93. The maximum award is $140,390.79. This represents an exceptionally good result for class members. In class counsel's experience, these individual recoveries far exceed typical recoveries in jail class action cases for similar types of conditions.

The distribution formula treats class members fairly based on the number of days they were incarcerated in the juvenile halls and juvenile camps. The distribution formula provides four times the compensation for each day of incarceration in the juvenile halls as it does for each day of incarceration in the camps. Incarceration in the halls is compensated at a higher rate based on investigation revealing substantially worse conditions in the halls. At the current claims rate, and assuming a 30% fee award, each juvenile hall incarceration day is valued at approximately $76.93 (which is also the minimum distribution amount in this case for youth who spent exactly 1 day in the juvenile halls).

The class's reaction to the settlement was very positive. Following a comprehensive notice campaign and six-month notice period, the parties received 1,559 claims (as of December 22, 2025) out of a total of 9,639 class members (including late claims), which represents a claims rate of 16.17%. There were no objections and only 6-7 opt-out notices. This is a great rate of participation, especially considering that there are a number of factors that complicated notice efforts in this case. The class is comprised of currently and formerly incarcerated youth, many of whom have experienced significant trauma, socio-economic hardship, educational and housing instability, and mental health problems. These circumstances make it more difficult to locate class members and ascertain whether they wish to submit claims. In addition, since class members were juveniles and thus did not have addresses in their own names when they were incarcerated, the challenges of successfully locating and reaching class members were greater than in an adult jail class action.

2

## II.    FINAL APPROVAL STANDARD UNDER FRCP 23(E)

Federal Rule of Civil Procedure 23(e)(2) provides that a settlement may be approved only on a finding that it is fair, reasonable, and adequate in light of the following factors:

(A)    the class representatives and Class Counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

(i)    the costs, risks, and delay of trial and appeal,

(ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment;

(D)    any agreement required to be identified under Rule 23(e)(3); and

(E)    the proposal treats class members equitably relative to each other.

We address each of these factors below, except (D) as there are no agreements required to be identified under Rule 23(e)(3) other than the parties' settlement agreement, which was previously provided to the Court.

## III.    THE PROPOSED SETTLEMENT IS FAIR REASONABLE AND ADEQUATE

The settlement in this case easily satisfies the standard for approval under Rule 23(e).

### A.    The Settlement Provides Adequate Relief to Class Members

The financial terms of the settlement are excellent and will result in significant direct compensation to class members. Class Counsel obtained a $30 million settlement with no reversion to the Defendants. After maximum administration costs ($163,000), litigation costs ($85,960.79), the incentive award ($25,000) and assuming a 30%-of-the-fund fee ($9M), there will be approximately

3

$20,726,239 for distribution to class members who were held in LA County juvenile detention facilities.

### 1.   *Individual Recoveries Represent an Excellent Outcome Considering the Costs, Risks and Delay of Trial and Appeal*

This settlement provides an exceptionally positive outcome to class members considering the costs, risks and delay of trial and appeal. Compensation for all class members who were incarcerated in the juvenile facilities, even for time periods as short as one day, serves to acknowledge the disregard for their rights and basic human needs. Class members who were incarcerated for very short time periods, and thus minimally exposed to the challenged conditions, will receive a relatively small compensation. (Class members incarcerated for a few days or less would have had no exposure to some conditions, such as access to rehabilitation programming, and likely no exposure to conditions such as room confinement or excessive pepper spray).

Class members incarcerated for longer periods of time – weeks, months or years – will receive substantial amounts of money reflecting greater exposure to the challenged conditions. They can apply these funds towards their financial need – including pursuit of their educational goals, housing, transportation or providing for their own families. These recoveries are particularly significant considering that claimants waived no claims for sexual abuse, sexual harassment, sexual assault, or physical abuse except for physical abuse in the form of pepper spray.

To date, there are 1,559 claims (as of December 22, 2025) out of a total of 9,639 class members (including late claims), a claims rate of 16.17%. Assuming this Court awards 30% for fees, the mean recovery is $13,286.05 and the median recovery is $5,307.93.[2] The largest recovery is $140,390.79. The smallest recoveries are $76.93 for class members with only one day of detention in a

---

[2] There are approximately 17 class members for whom the distribution amount has not yet been calculated because of missing data. Once these distribution amounts are calculated, the amounts provided in this motion will likely change by a small amount.

4

juvenile hall (25 claimants).

The chart below shows the distribution of claimant recoveries. More than 85% of class members will receive distributions of greater than $500. Approximately 25% of class members will receive recoveries between $1,000 - $5,000. 572 claimants will receive recoveries of over $10,000. 12 class members are expected to receive payments exceeding $100,000.



These recoveries are unprecedented in the experience of Barrett Litt, who has handled numerous jail conditions class actions over his career, none of which have resulted in average (mean) recoveries of over $10,000. *See* Dkt. 68-1, Litt Decl. ¶ 41.

The individual recoveries in this case represent a particularly positive outcome given the risks for further litigating the class action, not to mention the difficulty that class members would have experienced had they litigated individual lawsuits. The overwhelming majority of class members could not have pursued financially viable individual claims. And while some class members have larger claims based on longer periods of incarceration, many would have been unavailable or reluctant to come forward and challenge a system in which they were abused as minors.

Absent settlement, this case likely would have spread out over several more years litigating class certification and liability. While the liability issues in this case were strong, it is likely that class certification would have been hard fought. And

all civil rights litigation, even if not a class action, presents significant risk given the demanding standards governing § 1983 litigation. Federal civil rights litigation is precarious for plaintiffs given the powerful defenses available to government defendants (including qualified immunity), as well as the challenges establishing both individual and *Monell* liability. Analyzing liability in civil rights cases ordinarily requires extensive assessment of institutional defendants' policies and practices over time, how systemic breakdowns occurred, the responsibilities of individual decision-makers, and causation for the specific constitutional violation(s) at issue.

This case was no exception. To establish *Monell* liability for each of the challenged conditions, Plaintiffs' counsel would ultimately have been required to develop evidence showing that the challenged conditions represented a systemic failure arising from either a formal policy or sufficiently widespread practice to qualify as a custom (rather than an isolated oversight or mistake), over a period of time spanning more than a decade. Whereas some of the conditions could be tied to formal policies (e.g. shackling during transportation), other conditions arose from institutional practices that were inconsistently documented and were potentially susceptible to some variation over time, complicating the class and *Monell* analysis. For example, to establish class and *Monell* liability for failure to provide sufficient outdoor recreation time, showing a consistent practice over the duration of the class period required analyzing many years' worth of staff recreation logs to ascertain how much outdoor recreation time youth received and the various reasons why it may have been shortened or cancelled. The same intricate analysis was necessary to establish the existence of customs/practices with respect to overnight bathroom access, excessive room confinement, and excessive pepper spray. Inherent to these claims was a risk that a Court could disagree that the evidence was strong enough to establish a sufficiently widespread practice to qualify as a custom (or to demonstrate Rule 23(b)(3) predominance). In the absence of *Monell* liability, Plaintiff would have been required to link conditions during specific time

6

periods to the decision-makers responsible for those conditions, and to establish, for each decision-maker, the requisite state-of-mind to establish liability (e.g. deliberate indifference).

Among civil rights cases, conditions of confinement cases are particularly challenging given the deference awarded to correctional administrators. The Supreme Court has left "no doubt" that courts are to be "extremely deferential" to prison administrators. *See Amador v. Baca*, 2017 WL 9472901, at *4 (C.D. Cal. June 7, 2017) (the Supreme Court has emphasized the "substantial deference that must be given to prison officials in this [the strip/visual body cavity search] context"). Even among conditions of confinement cases, this case was particularly complicated given the breadth of the challenged conditions and the duration of the class period. For each of the liability issues in this case, Plaintiff would have been required to establish that the challenged conditions were unsupported by any safety or rehabilitative purpose and therefore amounted to impermissible punishment in a juvenile facility. This was especially challenging for conditions for which the justifications may have varied depending on the circumstances (e.g. use of room confinement or pepper spray). In addition to establishing systemic failures in training, oversight and supervision, Plaintiff was required to identify categories of circumstances in which various tactics could not be supported by safety/security justification (e.g. all youth shackled for transportation without an individualized assessment of security risk).

This case also presented significant risks in securing class certification. This case could only be pursued as a class action to the extent counsel could identify claims that would be susceptible, in whole or part, to classwide treatment for damages under FRCP 23(b)(3). Analyzing the viability of class treatment for the various claims proved especially challenging given the breadth of the confinement conditions at issue and the complexity of the liability analysis related to the issues. Class Counsel had to establish that the specific, alternate theories of liability supporting their claims that could be translated to classes and subclasses that

7

would satisfy FRCP Rule 23(b)(3)'s commonality, predominance and superiority requirements.

The risk and complexity were only underscored by the potential for individual damages analysis on some claims. From the outset of the litigation, defendants made clear that they would vigorously contest certification under FRCP 23(b)(3) if there were a contested class certification motion. Although Plaintiff believes they would have been successful in a contested class certification motion, even the most experienced counsel's assessment and belief is not certainty; the settlement smoothed the way for an uncontested class certification motion, mitigating the risk of losing class certification on any claims or issues.

Even if Plaintiff had secured both class certification and a favorable classwide liability decision, it was uncertain whether classwide general damages would have been found available and, if so, how much they would have been. Statutory damages were not available because no state law claims survived the statute of limitations (which is not tolled for minors under California law in claims against governmental entities or employees). Had individualized damages determinations been required, a far smaller percentage of the class would likely have come forward to pursue individual damages trials in comparison to the number that have filed claims (which requires little effort by class members). In addition, absent settlement, it is very likely that Defendants would have appealed any grant of class certification, any liability findings, and any adverse judgment, all of which would have significantly stalled class members actually receiving money.

Given the risks in establishing liability, securing class certification, and establishing class-wide damages, this settlement would be an outstanding result under any circumstances. It is an even more positive outcome considering the relative efficiency with which counsel were able to resolve the case. Counsel recognized that, for most class members, the benefits of securing such a strong settlement early would greatly outweigh the risks and uncertainty of proceeding with protracted litigation for some potential increase in compensation, the amount

of which would be speculative at best. The relatively expeditious resolution of this

case provides substantial benefits to class members by getting them money now.

### 2. The Settlement Employs a Fair & Effective Means of Distributing the Settlement to Class Members

Class Counsel designed a comprehensive, effective notice and outreach plan

that resulted in a claims rate of approximately 16%, which is consistent with

anticipated claims rates in adult jail class actions. In Class Counsel 's experience,

most jail class action cases have a claims rate of 10-25% (with most of those

falling in the 15-20% claims rate range) depending on various factors, including

the size of the class, the amount of potential recoveries, duration of the litigation

(and time lapsed since the relevant events experienced by class members), and the

characteristics of the class, including education levels, socio-economic hardship,

subsequent incarceration, immigration status, etc. See Supplemental Declaration of

Barrett S. Litt accompanying this motion (stating that, based on his experience of

litigating and settling approximately ten jail class actions, the most common claims

rate is 15-20 %). *See also, e.g., Boone v. City of Philadelphia*, 668 F. Supp. 2d 693,

703 (E.D. Pa. 2009) (reporting a 15% claims rate and five opt-outs in a strip search

class action); *Hardy v. D.C.*, 49 F. Supp. 3d 48, 50 (D.D.C. 2014) (14% claims rate

in class action regarding seized and forfeited cash from incarcerated persons

without providing adequate notice).

Among jail class actions, this case involved especially serious challenges in

locating class members at the notice stage. Because all of the class members were

individuals who have been incarcerated in juvenile facilities at some point in

approximately the past decade, even the oldest class members are relatively young.

Youth, including those who have had no contact with the juvenile justice system,

are more likely to share housing with family and roommates as they pursue

educational goals and build their lives and careers, often starting in lower paying

jobs. This means they may not have bank accounts, utilities, car payments or credit

cards in their own names, which makes them more difficult to locate using the skip

trace tools commonly employed by class administrators. The young people who comprise this class are likely to be even more difficult to locate using skip-trace tools. Youth who have been involved in the juvenile justice system are significantly more likely to have experienced economic hardship, trauma, or mental health challenges undermining their ability to secure stable housing, utilities, bank accounts and established credit histories. For the subset of class members who are older, and thus potentially more established, the events giving rise to this lawsuit occurred years ago and are now more remote in time. When the underlying events are so remote in time, class members may have less interest in pursuing claims and may be more difficult to locate given old class data, relocation, and even changes in names.

Drawing on experience from previous litigation involving difficult-to-locate class members, including deported class members, counsel worked diligently with Simpluris, the Claims Administrator, to devise a robust, comprehensive notice plan to ensure the highest possible response rate to the class notice. The notice plan involved multiple channels of direct notice via U.S. mail, text message and email. Notice was sent to class members, as well as their parents/guardians. Initial direct notice was reinforced with reminder and follow-up messages for the duration of the class period. The reminder notices consisted of text and email for all class members for whom this information was available. Prior to the close of the class period, the claims administrator sent a second round of mailed notice to all class members who had not yet submitted claims. Before sending the second round of mailed notice, the claims administrator performed a second round of skip-trace research to attempt to capture any class members whose correct contact information as not obtained in the first round (including, for example, any class members who may have moved or were in the process of relocating at the time the first notice issued). To supplement skip-trace efforts, the Claims Administrator searched CDCR records to identify class members who were currently incarcerated in CDCR facilities, and notice was sent to them. Along with Simpluris, Class

Counsel developed posters that Los Angeles County posted in the juvenile and adult detention facilities notifying detainees of the lawsuit and the procedure making claims. At Class Counsel's request, LA County provided a list of currently incarcerated individuals in a LA County facility and the claims administrator sent mail notice to each of them.

The settlement provided a simple, straightforward claims procedure whereby class members were able to submit a claim form by mail, email or online via the claims website. Online forms required a PIN number, which helps avoid the submission of thousands of fraudulent claims by non-class members or robots. All of the 1,559 claims addressed herein have been confirmed as legitimate claims and linked to the class data.

The distribution formula is based solely on the number of days in juvenile custody, with heavier weighting towards days in the halls. Specifically, a class member will receive four points for each day in a juvenile hall and one point for each day in a juvenile camp. The points for all valid claimants have been totaled, and each claimant's award will be based on their percentage share of the total number of points (determined by dividing the total points for each claimant by the total points for all claimants to yield a percentage of the recovery available).

Class members have flexible payment option, which is especially important for class members who may not have established banking accounts in which to deposit check. Class members have the option to be paid by physical check or electronically via Zelle, Venmo, PayPal, and electronic Mastercard.

### 3.    The Court Will Decide a Fair and Reasonable Fee

Class Counsel filed a motion for attorneys' fees and costs to be approved by the Court. (Dkt. 68) There was no clear sailing agreement, which are considered "important warning signs of collusion." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F. 3d 935, 948 (9th Cir. 2011) (internal cites and quotation marks omitted). The requested fee is based on the "percentage-of-recovery method [which] is favored in common-fund cases because it allows courts to award fees

from the fund in a manner that rewards counsel for success and penalizes it for failure." *Alberto v. GMRI, Inc.*, 2008 WL 4891201, at *11 (E.D. Cal. Nov. 12, 2008). The determination of a reasonable fee lies solely with the Court.

### 4. The Settlement is Fair and Reasonable to Minors

For the reasons set forth herein, this settlement is fair and reasonable to all class members, including minor class members. This class settlement provides the best mechanism to ensure that each young person receives meaningful compensation for the harm they endured while in-custody; many class members will receive an excellent recovery.

At the time the parties sought preliminary approval, there were 1,970 class members who had not yet turned 18 (11.6% of 9,187 total class members). Of the 1,559 claimants, there are only 149 (9.6%) who will not yet have turned 18 by the date of the final approval hearing. (The percentage of minor claimants roughly tracks the percentage of total minor class members indicating that the response rate from minor claimants was similar to the response rate for the class as a whole, and thus, that the notice campaign effectively reached minor claimants).

Most of the minor claimants will turn 18 within 1-2 years from the settlement distribution date. Minors' settlement funds will be held by the claims administrator in interest-bearing accounts until their 18th birthday, at which point the funds will be automatically disbursed to them via the payment method of their choice

### B.    Adequacy of Representation

At the final approval stage, courts assess the adequacy of representation by evaluating the "*actual* performance" of counsel. Fed.R.Civ.Pro. 23(e)(2) *Advisory Committee Notes to the 2018 Amendment* (emphasis supplied). District courts should specifically consider whether Class Counsel negotiated the settlement with an "adequate information base" given relevant circumstances, including, for example, the nature and amount of discovery and the outcome as compared to other similar cases. *Ibid.* (" … the nature and amount of discovery in this or other

1    cases, or the actual outcomes of other cases, may indicate whether counsel

2    negotiating on behalf of the class had an adequate information base.").

3         Before proceeding with settlement discussions, counsel invested substantial

4    time in analyzing and developing the issues in this case. Prior to filing the lawsuit,

5    Class Counsel spent months meeting with attorneys and community organizations

6    that work directly with justice-involved youth to ascertain their interest in civil

7    litigation and to better understand how a civil litigation strategy might complement

8    other efforts to secure justice for youth who have been subjected to illegal and

9    dehumanizing conditions in the juvenile detention facilities. During these

10   meetings, Class Counsel and community organizers explored how youth were

11   affected by their experiences in the juvenile halls and camps, what aspects of their

12   experience were most impactful, whether a damages class action would be

13   desirable to potential class members, and strategies to develop the evidence

14   necessary to secure class certification and ultimately liability. In addition, Class

15   Counsel consulted multiple experts and interviewed numerous putative class

16   members about their experiences in the juvenile halls during the class period.

17   These meetings began in August 2021 and continued until the time the complaint

18   was filed. Dkt. 68-1, Litt Decl., ¶ 44.

19        As these meetings progressed, Class Counsel obtained and reviewed

20   extensive government reports detailing abusive conditions within the juvenile

21   halls, in an effort to identify and refine viable federal claims that would be

22   susceptible to classwide treatment. This review encompassed a long history of

23   governmental reports over many years documenting problem conditions in the

24   juvenile halls, including from the United States Department of Justice, California

25   Attorney General's Office, California Board of State and Community Corrections

26   (BSCC) and Los Angeles County Office of the Inspector General (OIG). These

27   reports also helped to identify source materials to request in discovery to support

28   Plaintiff's claims. Class Counsel also attended meetings of the Probation Oversight

     Commission (POC) and virtually attended meetings of the BSCC to stay current on

the status of government investigations addressing the juvenile halls. Dkt. 68-1, Litt Decl., ¶¶ 45-46.

Beyond their informal investigation, Class Counsel also engaged in significant formal discovery efforts. After the complaint was filed, Plaintiff propounded discovery seeking a wide range of County documents necessary to analyze the duration, severity, and constitutionality of the conditions addressed in the complaint. For example, to assess whether the halls provided sufficient access to rehabilitation programming and outdoor recreation, Plaintiff sought and reviewed many thousands of pages of departmental policies, activity calendars, program logs, grievances, and incident logs reflecting when programming and recreation activities were cancelled for reasons other than weather. Plaintiff similarly assessed policies, incident logs, and grievances addressing use of force, room confinement, mechanical restraints, access to clean clothing and bedding, bathroom access, food sanitation, youth access to telephones or other means of communication to communicate with family/counsel, and access to counsel. Dkt.68-1, Litt Decl., ¶ 47.

Plaintiff also propounded comprehensive database document requests, including information contained in LA County's Probation Case Management System (PCMS) regarding detained youth detained born on or after February 14, 2002 (twenty years before the filing of the complaint, which was the relevant time period for the class because of minor tolling); a range of information for each class member (without identifying information) addressing issues relevant to them, including complaints, reports or other documents regarding the conditions/conduct alleged in the complaint; database information concerning such conditions; materials regarding the database structure, instructions, data fields, manuals and similar materials relevant to navigating the databases; sample database reports; data logs; classification and housing assignment materials; security or housing classification training materials; general staff training materials; organizational charts and staffing for various positions; supervisorial activities; documents

14

regarding provision of clean clothing, bathroom access, room or solitary confinement, clean underwear and bedding, grievances, food sanitation and edibility, internal communications and emails, staffing shortages, youth access to telephones or other means of communication to communicate with family, access to counsel, recreational rehabilitative and religious service access materials, program and activity logs. These database requests generated an enormous amount of data, which counsel reviewed and analyzed. Dkt. 68-1, Litt Decl., ¶ 48.

In addition, while conducting discovery, Class Counsel retained highly regarded juvenile justice experts, Barry Holman and Hillary Cairns, who submitted a detailed report addressing how conditions over the class period reflected a departure from widely-accepted standards for juvenile detention facilities. Class Counsel worked closely with these experts to survey how conditions within Los Angeles County compared to other large jurisdictions and to identify where Los Angeles County's policies and practices deviated from the practices of other jurisdictions. In addition to the juvenile justice experts, Class Counsel worked closely with a correctional psychiatry expert, Dr. Terry Kupers to analyze the psychological impact of conditions within the juvenile detention facilities including the ways in which such conditions undermined rehabilitation efforts and mental health outcomes. Dkt. 68-1, Litt Decl., ¶ 51. Only after completing this substantial preliminary discovery and expert analysis did the parties proceed to mediation to determine whether the case could be resolved before class certification and dispositive motion litigation.

### C.    Equitable Treatment of Class Members

The treatment of class members is equitable. All class members receive identical treatment for their time in juvenile hall, and identical treatment for their time in juvenile camp custody. The juvenile halls receive greater compensation than the juvenile camps because the parties' investigation revealed that conditions in the juvenile halls were more egregious than conditions in the camps. The settlement also provides a slight benefit to Mr. Herrera ($25,000 in addition to his

15

1    class member formula award), whose participation was indispensable to the

2    outcome.

3    ### D.    Arms-Length Negotiations

4         The settlement terms were negotiated at arms' length with the assistance of

5    experienced and highly regarded mediator, Antonio Piazza. The parties deferred

6    mediation until after both sides had thoroughly assessed the strengths and

7    weaknesses of their position with respect to liability, class certification and

8    damages, based on extensive discovery, review of government investigations, and

9    informal investigation including numerous meetings with class members and

10   community organizations.

11   ### E.    There Were No Objections

12        There were no objections to the settlement agreement. *See, e.g., Nat'l Rural*

13   *Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004)

14   ("It is established that the absence of a large number of objections to a proposed

15   class action settlement raises a strong presumption that the terms of a proposed class

16   settlement action are favorable to the class members.") (citing several cases); *Carlin*

17   *v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1013 (E.D. Cal. 2019) (same).

18   ### F.    Late Claims

19        Pursuant to the settlement agreement, the parties have agreed to approve all

20   late claims received through the date of the final approval hearing. *See* Dkt. 63-2,

21   p. 18. As of December 22, 2025, the claims administrator has received 26 late

22   claims. These claims are included in the calculations above. The parties will

23   continue to approve late claims through the date of the final approval order and

24   payment of funds to the claims administrator. This may slightly, but not

25   significantly, alter the mean and median recoveries of class members. Absent

26   extraordinary circumstances, the parties will not be able to approve late claims

27   after funds have been transferred and the claims administrator performs a final

28   distribution calculation.

## IV.    CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court grant final approval to the classwide settlement in this matter.

DATED: December 29, 2025         Respectfully submitted,

McLANE, BEDNARSKI & LITT, LLP
RAPKIN & ASSOCIATES, LLP

By: */s/ Barrett S. Litt*
 Barrett S. Litt

By: */s/ Lindsay Battles*
 Lindsay Battles

By: */s/ Scott B. Rapkin*
 Scott B. Rapkin

Attorneys for Plaintiffs